**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| LANDSCAPE CONSULTANTS OF TEXAS, INC.,<br><br>Plaintiff,<br>v.<br><br>HARRIS COUNTY, TEXAS,<br><br>Defendant. | Civil Action No. 4:25-cv-00479 |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF MATERIAL FACTS ........ 1

STANDARD OF REVIEW ........ 10

SUMMARY OF ARGUMENT ........ 11

ARGUMENT ........ 13

I. Harris County's MWBE Program Violates the Equal Protection Clause ........ 13

A. Harris County lacks a compelling interest to racially discriminate ........ 14

1. A remedial racial classification is constitutional only when directed to specific, identified unlawful discrimination ........ 14

2. "Passive participation" does not eliminate the requirement of specific, identified discrimination ........ 16

3. Harris County identifies no specific unlawful discrimination that the Program remedies ........ 17

4. The Study's statistical and anecdotal evidence does not establish the intentional discrimination necessary to support Harris County's asserted remedial interest ........ 18

B. Harris County's MWBE Program is not narrowly tailored ........ 19

1. The Program is not an exact fit between the identified discrimination and the racial remedy ........ 20

2. Harris County did not establish that race-neutral measures were inadequate before imposing racial goals ........ 20

3. The Program is both overinclusive and underinclusive ........ 21

4. The Program may continue indefinitely ........ 23

C. Harris County's MWBE Program violates the "twin commands" of equal protection ........ 23

II. Harris County's MWBE Program Racially Discriminates in Violation of 42 U.S.C. § 1981 ........ 24

CONCLUSION ........ 25

CERTIFICATE OF SERVICE ........ 26

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995) .......... 13, 19–20, 25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) .......... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 11

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) .......... 15–16, 18–22

*Crowe v. Henry*,
115 F.3d 294 (5th Cir. 1997) .......... 11

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) .......... 24–25

*Grutter v. Bollinger*,
539 U.S. 306 (2003) .......... 22

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993) .......... 25

*Landscape Consultants of Tex., Inc. v. City of Houston*,
No. 4:23-cv-3516, 2026 WL 2170880 (S.D. Tex. July 28, 2026) .......... 13–15, 17

*Louisiana v. Callais*,
146 S. Ct. 1111 (2026) .......... 14

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) .......... 11, 14–16, 19

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976) .......... 24

*Nuziard v. Minority Bus. Dev. Agency*,
721 F. Supp. 3d 431 (N.D. Tex. 2024) .......... 22

*Palmore v. Sidoti*,
466 U.S. 429 (1984) .......... 24

*Shaw v. Hunt*,
517 U.S. 899 (1996) .......... 15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)....................11, 13–16, 23–24

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) ....................22

*W.H. Scott Constr. Co. v. City of Jackson*,
199 F.3d 206 (5th Cir. 1999) ....................15–16, 18

*Walker v. City of Mesquite*,
169 F.3d 973 (5th Cir. 1999) ....................19–21

*Wilson v. Tregre*,
787 F.3d 322 (5th Cir. 2015) ....................10–11

**Statutes**

42 U.S.C. § 1981....................24

42 U.S.C. § 1981(a) ....................24

42 U.S.C. § 1981(b) ....................25

Harris County Code Ch. 15D *et seq*. ....................1

**Regulation**

29 C.F.R. § 1607.4(D) ....................7

**Rule**

Fed. R. Civ. P. 56(a) ....................10–11

## INTRODUCTION

Harris County requires Landscape Consultants to give work to competitors because of its owners' race. After full discovery, however, the County cannot identify a single contract awarded through racial discrimination, a single County official who discriminated in awarding a contract, or a single contractor sanctioned for discriminating against a subcontractor. This has never been enough to justify a race-conscious public contracting program. A disparity is not discrimination, and *Croson* has always required specific evidence identifying the discrimination that a racial remedy is designed to cure. *Students for Fair Admissions* and *Callais* now make the point unavoidable: government may use race to remedy specific, identified unlawful discrimination, not simply to correct racial disparities.

For the reasons set forth below, Plaintiff Landscape Consultants of Texas, Inc. is entitled to summary judgment on its Equal Protection and 42 U.S.C. § 1981 claims pursuant to Fed. R. Civ. P. 56.

## STATEMENT OF MATERIAL FACTS

**Harris County's Minority and Women-Owned Business Enterprise Program**

Harris County adopted its Minority-and Woman-Owned Business Enterprise (MWBE) Program on November 10, 2020, after commissioning a disparity study from Colette Holt & Associates. Wilcox Decl.,[1] ¶ 2, Ex. 2. The MWBE Program is codified at Harris County Code Ch. 15D *et seq*. Harris County separately retained consultant Colette Holt to assist in drafting the County's first MWBE policy based on Holt's Study and recommendations. *Id.*

In an October 2021 presentation introducing Harris County's new MWBE Program, Holt described MWBE programs as "[r]ace-and gender-conscious programs designed to remedy the

[1] Exhibits are attached to the declaration of Erin Wilcox and labeled by number. For the remainder of the brief, they will be cited simply by their exhibit number.

effects in contracting and procurement markets" and identified the County's Program as such a program. Ex. 17 at HCO-006816. The Program expressly classifies businesses according to the race and sex of their owners.[2] "Minority" means Black Americans, Hispanic Americans, Native Americans, Asian Americans, or "other minorities defined" in the 2020 Study. Ex. 2 at HCO-000189. Harris County admits that this definition of "minority" was not based on specific data from the Harris County market area. Ex. 4 at 3–4.[3] Harris County does not issue MWBE certifications but accepts certifications issued by third parties. Ex. 9 at HCO-000379; Ex. 5 (Hausman Dep. 12:4–18).

The Program contains both an overall annual MWBE goal and contract-specific requirements. Harris County established an annual aspirational goal that MWBEs receive thirty percent of County contract spending. Ex. 3 at 8; Ex. 14 at HCO-000464. That figure closely tracks the Study's estimate that MWBEs constitute 28.4 percent of the firms "available" for County contracting. *Id.* The Study expressly recommended that the County use that 28.4 percent weighted-availability estimate as the basis for its annual spending goal and use its unweighted MWBE availability estimates as the starting point for contract-specific goals. Ex. 1 at HCO-005251.

Contract-specific MWBE goals are not aspirational. Ex. 9 at HCO-000379.[4] A bidder must address the advertised goal when it submits its bid. Harris County requires the bidder either to demonstrate that it will meet the MWBE goal or demonstrate sufficient "good faith" efforts to do so. *Id.* Failure to do either at the time of bid submission results in the rejection of the bid. *Id.*

---

[2] Plaintiff does not challenge the Program's sex-based classifications in this lawsuit.

[3] Defendants separately admit that the 2020 Disparity Study does not contain a specific definition of "minority," nor does it include a specific listing of countries of origin that are included in the definition of "minority." Ex. 4 at 3–4.

[4] All contracts valued at $50,000 or more are formally procured, but contracts under $50,000 are considered "small purchases" and would be below the threshold for the MWBE program contract compliance. *See* Ex. 14 at HCO-000486.

A bidder may satisfy the goal through qualifying participation by certified MWBEs. Ex. 9 at HCO-000379–000381. Such participation can include subcontracting work to MWBEs, joint-venture participation, qualifying purchases from MWBE suppliers, and—for MWBE prime contractors only—performing the work itself. *Id.* Under this last option, certified MWBE prime contractors may self-perform the entire amount of a project's MWBE goal with its own employees. *Id.*; Ex. 2 at HCO-000197; *see also* Ex. 14 at HCO-000471; Ex. 16 at HCO-0006575 ("Work performed by the M/WBE with its own forces and the necessary materials counts 100%."). However, a non-MWBE prime contractor cannot self-perform any portion of the MWBE goal and must subcontract 100 percent of the goal to an MWBE subcontractor. Ex. 2 at HCO-000197.

Bids must include an MWBE Utilization Plan, which details how a bidder will satisfy the project's MWBE goal. Ex. 9 at HCO-000382. If the bidder cannot fulfill the MWBE goal, the bidder must submit a "good faith" efforts checklist and supporting documentation. *Id.* at HCO-000383, 000385.

Harris County's Department of Economic Equity and Opportunity ("DEEO") administers these requirements. Ex. 14. It participates in the procurement process before award, determines contract-specific MWBE goals, reviews bidders' Utilization Plans and good faith efforts, decides whether those submissions comply with the Program, and monitors MWBE participation after award. *Id.*; Ex. 5 at 73:11–16, 131:8–132:24. DEEO generates individual MWBE goals through the County's "B2G system" (Business-to-Government). Ex. 5 at 65:13–66:12. The system was established by DEEO under Holt's guidance to follow the MWBE availability[5] identified in the 2020 Disparity Study. *Id.*

[5] The County's Rule 30(b)(6) representative further testified that she was unaware of any separate written methodology or guidelines governing the "weighted-scope" calculation or the "work that was identified for the goal setting." Ex. 5 at 65:6–66:12.

If a bidder cannot meet the MWBE goal, a DEEO project monitor evaluates its good faith efforts to subcontract with a MWBE firm. The County's 30(b)(6) witness testified that there is no set threshold or fixed numerical cutoff that determines when a bidder has made sufficient good faith efforts. Ex. 5 at 91:3–22, 94:15–95:16. DEEO does not determine whether the MWBE firms identified as "available" actually have the capacity to perform the work at the relevant time. *Id.* at 95:17–21. If the bidder neither meets the goal nor establishes sufficient good faith efforts, DEEO rejects the bid as nonresponsive. *Id.* at 93:5–18.

When a contract is completed, DEEO evaluates final MWBE goal attainment. DEEO staff are instructed to determine whether any shortfall occurred and, if sufficient good faith efforts were not established, to notify the contractor, Purchasing, the user department, and the Law Department. Ex. 16 at HCO-006594. Sanctions include withholding funds, temporary suspension of work, contract termination, suspension, and debarment from future Harris County contracts. Ex. 2 at HCO-000205.

**Plaintiff Landscape Consultants**

Landscape Consultants of Texas (Landscape Consultants) is a family-owned landscaping company that has been serving the Houston area for decades. Ex. 13 (G. Thompson Dep. 16:4–19). Landscape Consultants performs landscape maintenance, irrigation, installation, and related grounds-maintenance work. Ex. 12 (J. Thompson Dep. 18:22–19:5, 36:10–16). Government contracting is approximately eighty to ninety percent of Landscape Consultants' business. *Id.* at 19:6–9. It began bidding for Harris County work around 2007 or 2008 and won an estimated ten to twenty County contracts for landscaping and grounds-maintenance services. *Id.* at 18:22–19:20, 52:17–53:13.

Landscape Consultants is not a certified MWBE. *Id.* at 18:16–21. Co-owner Gerald Thompson testified that Landscape Consultants subcontracts "only when absolutely necessary," including when work requires equipment or expertise the company does not possess. Ex. 13 at 17:18–18:13. General Manager Jeremy Thompson testified that, outside of MWBE requirements, Landscape Consultants typically only subcontracts for tree trimming work for trees over a certain height, and lawn maintenance where it lacks enough staff in-house to complete the work. Ex. 12 at 33:3–34:20. When its choice is not mandated by the MWBE Program, Landscape Consultants chooses subcontractors based on business need and prior experience with the subcontractor. *Id.* at 36:10–38:8. On projects that can be performed entirely with its own employees, the company must still utilize MWBE subcontractors to satisfy the contract's mandatory MWBE goal. For example, after Harris County imposed an eleven percent MWBE goal on the Eastgate and Oates Cemeteries grounds maintenance project, Job No. 21/0336, and threatened penalties for non-compliance, Landscape Consultants engaged a MWBE subcontractor to perform mowing work that Landscape Consultants' own employees could have completed. Ex. 10 at HCO-000871.

The County's MWBE Program impacts Landscape Consultants' bid pricing. Because of the Program, there are at least five occasions where Landscape Consultants increased the prices of its bids for Harris County solicitations—Job Nos. 23/0465, 24/0312, 24/0322, 24/0355, and 24/0388—to accommodate payments to MWBE subcontractors associated with the County's MWBE goals. Ex. 11 at 5–6; Ex. 12 at 63:9–13 (bid pricing could vary from ten to twenty percent due to MWBE goal), 132:20–134:13. Landscape Consultants must also schedule work around the MWBE subcontractor's availability, while its own employees sit idle. Ex. 12 at 156:17-157:3. And where employees sit idle, attrition is a risk. *Id.* at 156:20–24. Despite this, Landscape Consultants continues to compete for Harris County landscaping work. *Id.* at 36:11–38:2.

**The 2020 Disparity Study**

Harris County's MWBE Program is intended, in part, to remedy past discrimination in County contracting and to prevent the County from functioning as a "passive participant" in discrimination, including discrimination in subcontracting related to County contracts. Ex. 3 at 3. Harris County admits that "no contract has been deliberately awarded merely because of the applicant's race, color, ethnicity, or sex." Ex. 15 at 4. The County instead relies on the 2020 Disparity Study as evidence of unlawful discrimination in the marketplace for County contracting and states that Harris County has, "at a minimum, been a passive participant in such discrimination." *Id.*; Ex. 5 at 122:17–123:6.

The 2020 Disparity Study likewise states that evidence supporting a race-conscious contracting program may include a government entity's "passive participation" in a system of racial exclusion. Ex. 1 at HCO-000010, 000019, 000025. The Study identified two principal forms of proof relevant to that inquiry: statistical evidence comparing MWBE utilization to MWBE availability and anecdotal evidence concerning discriminatory barriers. *Id.* at HCO-000021–000022, 000025, 000028, 000052. Harris County describes the violations the Program is intended to remedy in the same terms. It states that "the constitutional violations that were intended to be remedied by the MWBE Program were described in the 2020 Disparity Study," and that these violations are not established on a "contract-by-contract" basis, but by (1) statistical evidence of the underutilization of minority- and woman-owned firms compared to their availability and (2) anecdotal evidence of race- or gender-based barriers in the relevant market. Ex. 3 at 7.

**The Disparity Study's Quantitative Evidence**

The 2020 Disparity Study analyzed County-funded contracting from fiscal year 2016 through the first quarter of fiscal year 2019. Ex. 1 at HCO-000012. Its final contract data file

included 478 prime contracts and 1,433 subcontract records totaling approximately $1.260 billion. *Id.* Landscaping Services, NAICS[6] 561730—the industry in which Plaintiff Landscape Consultants competes—accounted for approximately $4.12 million, or 0.4 percent, of the approximately $1.086 billion constrained market analyzed. Ex. 1 at HCO-000056, HCO-000060.

The Study's principal contracting measure was a "disparity ratio." Ex. 1 at HCO-000037–000039. The Study calculated a group's utilization as its share of County contracting dollars and compared that figure to the group's estimated availability in the relevant contracting market. *Id.* The disparity ratio is calculated by dividing utilization by availability and multiplying by 100. A ratio of 100 percent reflects utilization equal to estimated availability; a ratio below 100 percent reflects utilization below estimated availability. *Id.* The Study used two separate measures in evaluating those ratios. First, it treated a disparity ratio of eighty percent or less as "substantively significant," using the EEOC's four-fifths rule.[7] *Id.* at HCO-000068–000069. The Study stated that a substantively significant disparity supports an inference that the result "may be caused by the disparate impacts of discrimination." *Id.* Second, it separately evaluated statistical significance, which the Study described as whether an observed result was unlikely to have occurred by random chance. *Id.*

---

[6] "NAICS" refers to the "North American Industry Classification System." Ex. 1 at HCO-000012.

[7] The Disparity Study cites to U.S. Equal Opportunity Employment Commission regulation, 29 C.F.R. § 1607.4(D), quoting the following: "A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." Ex. 1 at HCO-000069 n.135.

**Table 3-11: Disparity Ratios by Demographic Group**

| | Black | Hispanic | Asian | Native American | White Women | M/WBE | Non-M/WBE |
|---|---|---|---|---|---|---|---|
| Disparity Ratio | 6.0%‡ | 43.0%‡* | 19.8%‡ | 22.8%‡ | 54.1%‡ | 32.0%‡*** | 126.8%*** |

*Source: CHA analysis of Harris County data; Hoovers; CHA Master Directory.*
*‡ Indicates substantive significance.*
****Indicates statistical significance at the 0.001 level.*[136]

Table 3-11 of the Disparity Study reported disparity ratios of 6.0 percent for Black-owned firms, 43.0 percent for Hispanic-owned firms, 19.8 percent for Asian-owned firms, 22.8 percent for Native-American-owned firms, 54.1 percent for White-woman-owned firms, 32.0 percent for MWBEs collectively, and 126.8 percent for non-MWBEs. *Id.* at HCO-000069. The Study marked each MWBE-group ratio below eighty percent as "substantively significant."[8] Accordingly, it designated the Black, Hispanic, Asian, Native-American, White-woman, and aggregate MWBE ratios as "substantively significant" because each fell below the eighty percent threshold. *Id.* The Study separately evaluated statistical significance. It marked the Hispanic-owned-firm ratio as statistically significant at the .05 level and the aggregate MWBE and non-MWBE ratios as statistically significant at the .001 level.[9] The Black, Asian, Native-American, and White-woman ratios were not marked as statistically significant. *Id.*; Ex. 3 at 12. Table 3-11 did not separately calculate disparity ratios for prime contracts and subcontracts. The Study aggregated prime and subcontract dollars and contains no separate table measuring prime-contract or subcontract disparities standing alone. Ex. 3 at 11–12.

---

[8] *See id.* at HCO-000069: "A 'large' or 'substantively significant' disparity is commonly defined by courts as utilization that is equal to or less than 80 percent of the availability measure. A substantively significant disparity supports the inference that the result may be caused by the disparity impacts of discrimination."

[9] *See also id.* at HCO-000136: "Many tables in this Report contain asterisks indicating that a number has statistical significance at 0.001, 0.01, or 0.05 levels (sometimes, this is presented as 99.9 percent; 99 percent and 95 percent, respectively) and the body of the report repeats these descriptions."

The Study considered all firms in a particular NAICS code within the Harris County market to be equally available; its analysis did not take into account a firm's size, qualifications, willingness to bid on Harris County contracts, or history of bidding on Harris County or other government contracts. Ex. 7 (Pitts Dep. 107:19–108:20).

For Landscaping Services specifically, the Study reported MWBE utilization of approximately 10.3 percent. Ex. 1 at HCO-000063; Ex. 18 at 13; Ex. 19 at 17. The Study uses a single aggregate disparity ratio of 0.32 as evidence of county-wide discrimination. But this 0.32 aggregate disparity ratio masks wide variation across individual industries. For example, in a sample of twenty-nine NAICS codes tested by Harris County's expert, eleven—including landscaping services—had disparity ratios at or above parity, which reflects MWBE utilization equal to or exceeding MWBE availability in those industries. *See* Ex. 19 at 17–18. Following Plaintiff's rebuttal expert witness disclosure, Harris County's expert economist Steven Pitts identified duplicate firm entries in the Hoovers availability database used in the original Study. Ex. 7 at 82:11–83:11. His revised analysis removed more than 1,100 entries, and Pitts confirmed that those duplicate entries had been included in the original Study. *Id.* at 83:24–84:11. Pitts further testified that the disparity analysis does not determine the reason a firm did not receive County contracts, and that the quantitative analysis would not identify an individual County official engaging in discriminatory conduct or a particular prime contractor engaging in a discriminatory act against a subcontractor. *Id.* at 32: 3–20.

**The Disparity Study's Anecdotal Evidence**

The disparity study also incorporates anecdotal evidence gathered through interviews, a public meeting, and public comments. Ex. 6 at 73:13–21. Neither Holt nor Harris County

investigated or corroborated any stories of racial or sex-based discrimination that were raised in interviews or comments. *Id.* at 74:21–75:11.

Harris County admits that the Study "does not list specific incidents (identifiable by name or by contract) that constitute past violations of the U.S. Constitution or statutes." Ex. 3 at 6. Harris County has identified no specific prime-contract award resulting from intentional discrimination from January 1, 2018, to the present. Ex. 4 at 2. After consulting County databases and principal staff, Harris County identified no instance during that period in which it sanctioned a contractor for discriminating against subcontractors or investigated or sanctioned a County employee or official for discrimination in procurement or the award of County contracts. Ex. 3 at 5. Harris County's Rule 30(b)(6) representative likewise testified that she was unaware of any contractor or subcontractor reporting that Harris County had denied it a contracting opportunity because of race. Ex. 5 at 125:18–126:3.

**The Program's Continued Operation**

The 2020 Policy provided that the MWBE Program would sunset five years after adoption unless reenacted and required Harris County to conduct another disparity study before the sunset date. Ex. 5 at 127:1–10. The original five-year period ended on November 10, 2025. As of May 2026, the Program "has not been sunset" and the 30(b)(6) witness believed that the Commissioners Court had taken action to reenact it. *Id.* at 127:21–128:6. A replacement disparity study is underway and tentatively expected to be completed in early 2027. *Id.* at 128:7–129:3. Meanwhile, the availability figures from the 2020 Study remain the basis used in DEEO's contract-specific goal-setting process. *Id.* at 64:7–66:12.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). "A factual dispute is 'genuine,' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Where the nonmoving party bears the burden of proof on an issue at trial, the movant need only point to the absence of evidence, shifting the burden to the nonmoving party to show why summary judgement should not be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## SUMMARY OF ARGUMENT

The Supreme Court is unequivocal: "Racial discrimination is invidious in all contexts." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181, 214 (2023) (cleaned up). Public contracting is one of those contexts. Because Harris County's race-conscious public contracting program expressly classifies contractors based on race, it is presumptively unconstitutional and must satisfy strict scrutiny. *Id.* at 206. Harris County fails to meet this burden on all fronts.

*First*, Harris County lacks a compelling interest for its use of racial classifications. As clarified by both *SFFA* and *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), government may only use race to remedy "specific, identified instances of past discrimination that violated the Constitution or a statute"—not generalized statistical disparities or a self-described role as a passive participant in general marketplace discrimination. Harris County can identify no specific discriminatory contracts, no County official or employee who racially discriminated against a contractor, and disciplined no prime contractor for discriminating against subcontractors. Harris County's 2020 disparity study, which is the basis for the MWBE Program, measures outcome disparities, not their cause, and its own expert concedes the Study cannot identify whether any firm's failure to win a contract was due to discrimination as opposed to any other reason. In a

substantially similar challenge to the City of Houston's MWBE program, Judge Hittner recently found the failure to remedy identified, specific instances of past discrimination that violated the Constitution or a statute fatal to Houston's race-based public contracting program. Harris County's Program suffers the same defects.

*Second*, Harris County's Program is not narrowly tailored. Instead of a last resort, Harris County implemented race-conscious remedies alongside race-neutral tools, with no determination that race-neutral methods had failed. The Program is also simultaneously overinclusive and underinclusive; overinclusive in that it includes businesses who have never been discriminated against, and underinclusive in that it excludes non-MWBEs who have experienced discrimination. And despite a sunset provision, Harris County cannot define when its Program will end.

*Third*, the Program independently violates the equal protection's "twin commands" by using race as a negative that forces non-MWBE contractors to subcontract a MWBE goal's value, which MWBE contractors may retain. And it uses race as a stereotype, presuming that every minority-owned firm requires government assistance without any individualized showing of injury.

*Finally*, Harris County's intentional racial discrimination violates 42 U.S.C. § 1981, which bars discrimination in the making of contracts "against, or in favor of, any race."

The material facts underlying each of Plaintiff's arguments—drawn from Harris County's own discovery responses, disparity study, and witness testimony—cannot be genuinely disputed. This Court should grant Landscape Consultant's motion for summary judgment.

## ARGUMENT

### I. Harris County's MWBE Program Violates the Equal Protection Clause

Harris County's MWBE Program expressly classifies contractors by race. The Program's architect describes it as a "[r]ace- and gender-conscious" contracting program, and the Program treats firms differently depending upon the race their owners. Ex. 2 at HCO-000197; Ex. 9 at HCO-000379–000381; Ex. 17 at HCO-006816. Such classifications are "presumptively unconstitutional" and survive only if Harris County satisfies strict scrutiny by proving that its use of race serves a compelling governmental interest and is narrowly tailored to that interest. *SFFA*, 600 U.S. at 206–07; *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). Harris County's Program falls short of this "daunting two-step examination." *SFFA*, 600 U.S. at 206.

Just weeks ago, another court in this District permanently enjoined the use of race in the City of Houston's and Midtown Management District's public-contracting programs in an action brought by Landscape Consultants. *See Landscape Consultants of Tex., Inc. v. City of Houston*, No. 4:23-cv-3516, 2026 WL 2170880 (S.D. Tex. July 28, 2026). The parallels between the invalidated Houston contracting program and Harris County's Program are instructive. Like Harris County, Houston's program was intended to mitigate and remedy the effects of past discrimination, not to remedy any single, specific past constitutional violation. 2026 WL 2170880, at *2. Like Harris County, Houston could not identify any prime contract awards based on intentional discrimination against minority bidders in the past five years, had not disciplined any employee or official or discrimination, or identified any specific constitutional or statutory violations related to its public contracting program in the last five years. *Id*. Like Harris County, Houston instead identified statistical disparities to justify its race-conscious remedial program. *Id*. at *2–3. And like Harris County, Houston's race-based public contracting program permitted minority-owned firms

to self-perform MWBE goals, while nonminority-owned firms were required to subcontract the entire value of the MWBE goal. *Id.* at *4.[10]

Applying *SFFA* and the Supreme Court's intervening decision in *Louisiana v. Callais*, 146 S. Ct. 1131, *judgment entered*, 146 S. Ct. 1111 (2026), Judge Hittner held that a public-contracting entity must identify "concrete, particularized discrimination" and that generalized evidence of marketplace disparities does not establish a compelling interest in racial preferences. *Landscape Consultants*, 2026 WL 2170880, at *11–12. Because Houston's program failed to comply with this framework, it failed strict scrutiny. *Id.* at *12.

Harris County's Program suffers from the same constitutional defect. The County identifies no specific constitutional or statutory discrimination that its racial classifications remedy; instead, it relies on questionable statistical disparities and anecdotes as evidence that it was a "passive participant" in discrimination somewhere in the broader contracting marketplace. Even if that established a compelling interest—it does not—the Program is not narrowly tailored to any identified injury. And the Program independently violates equal protection's commands against using race as a negative or stereotype.

### A. Harris County lacks a compelling interest to racially discriminate

#### *1. A remedial racial classification is constitutional only when directed to specific, identified unlawful discrimination*

Harris County cannot justify racial discrimination merely by invoking "remediation." The Supreme Court has recognized only an exceedingly narrow remedial interest permitting government to classify citizens by race: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207. *Callais* made

---

[10] In this respect Harris County's Program goes further than Houston; under Houston's program, MWBE contractors could only self-perform 50% of a contract's MWBE goal, while Harris County's Program permits 100% self-performance.

the required specificity unmistakable. To establish a compelling remedial interest, "the discrimination must be 'identified discrimination.'" *Callais*, 146 S. Ct. at 1152–53 (quoting *Shaw v. Hunt*, 517 U.S. 899, 909 (1996)). The government must "identify the specific instances of past discrimination that it aims to remediate" so that it can "'determine the precise scope of the injury it seeks to remedy.'" *Id.* (quoting *Shaw*, 517 U.S. at 909). The government has no compelling interest in generally correcting "past discrimination in a particular industry or region" or "the effects of societal discrimination." *Id.* (quoting *Shaw*, 517 U.S. at 909–10).

That rule flows directly from *City of Richmond v. J.A. Croson Co.*, which held that a generalized assertion of discrimination in an industry cannot establish the necessary remedial interest because it does not identify the injury that racial classifications supposedly cure. 488 U.S. 469, 498–500 (1989). And the Fifth Circuit likewise requires a local government to "identify" discrimination "with the particularity required by the Fourteenth Amendment" and establish a factual predicate connecting its race-conscious contracting requirements to identified injury. *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 217–18 (5th Cir. 1999) (quoting *Croson*, 488 U.S. at 492).

Judge Hittner recently applied these principles to municipal contracting. He concluded that *Callais* confirms *SFFA*'s applicability beyond university admissions and held that Houston bore the burden to show its race-conscious contracting program remedied "specific, identified instances of past discrimination that violated the Constitution or a statute." *Landscape Consultants*, 2026 WL 2170880, at *11–12 (quoting *SFFA*, 600 U.S. at 207). Because Houston could not do so, its program failed strict scrutiny. *Id.* at *12. The same rule controls here: Harris County must identify the unlawful discrimination that its racial contracting preferences are designed to remedy. It cannot

satisfy that burden merely by showing that racial groups experienced different aggregate contracting outcomes.

2. *"Passive participation" does not eliminate the requirement of specific, identified discrimination*

Different aggregate contracting outcomes are Harris County's only evidence of the discrimination its Program is intended to remedy. Harris County's corporate representative testified that the 2020 disparity study shows discrimination in the County contracting marketplace and that the County has "at a minimum, been a passive participant in such discrimination." Ex. 5 at 122:17–123:6; Ex. 15 at 4. This falls far short of the requirement of specific, identified unlawful discrimination required to justify the use of racial classifications. To be sure, *Croson* recognized that a municipality may act when its public spending makes it a "passive participant" in an identified system of private racial exclusion, and *W.H. Scott* repeated that formulation. 488 U.S. at 492; 199 F.3d at 217. But neither case permits a municipality to equate statistical imbalance with a system of intentional, unlawful racial exclusion. *W.H. Scott*, 199 F.3d at 217 (requiring the government to identify discrimination "with the particularity required by the Fourteenth Amendment" (quoting *Croson*, 488 U.S. at 492).

*SFFA* and *Callais* now clarify what that requirement demands. The remedial interest is not "discrimination" at some generalized level; it is specific, identified discrimination violating the Constitution or a statute. *SFFA*, 600 U.S. at 207. *Callais* further rejects a governmental interest in remedying discrimination merely because it occurred within a particular region or industry. 146 S. Ct. at 1152–53. Remedying past societal or general discrimination is not enough. *Id*. at 1153. The County's own discovery responses confirm that the supposed violations underlying its Program are established through statistical underutilization and anecdotal evidence concerning barriers in the marketplace. Ex. 3 at 7. And the County's witnesses confirm the County's position that the

2020 Study establishes marketplace discrimination and passive participation; it does not identify specific instances of discrimination or determine why firms are not awarded contracts. Ex. 5 at 122:17–126:3; Ex. 7 at 32:4–33:23, 100:10–18.

Judge Hittner rejected this same "passive participation" theory in Landscape Consultants' challenge to the City of Houston race-based public contracting program. Judge Hittner concluded that, after *SFFA* and *Callais*, a public-contracting entity must identify "concrete, particularized discrimination"; general marketplace evidence is not enough. *Landscape Consultants*, 2026 WL 2170880, at *12. Harris County's invocation of "passive participation" therefore does not cure the absence of the identified unlawful discrimination that *SFFA* and *Callais* require.

*3. Harris County identifies no specific unlawful discrimination that the Program remedies*

The architect of Harris County's Program testified that it does not—and was not intended to—remedy specific, identified constitutional or statutory violations. Ex. 6 at 85:10–19. Nor could it. Harris County concedes that the 2020 Study "does not list specific incidents (identifiable by name or by contract) that constitute past violations of the U.S. Constitution or statutes." Ex. 3 at 6. When asked to identify the specific violations the Program was intended to remedy, Harris County could not identify any particular discriminatory action on behalf of the County or a prime contractor; it responded instead that the violations were established "not on a contract-by-contract basis," but through statistical underutilization and anecdotal evidence. *Id.* at 7.

Harris County's discovery responses and witnesses confirm this failure. Harris County has identified no specific prime-contract award resulting from intentional discrimination from January 2018 to the present. Ex. 4 at 2. After reviewing its databases and consulting County personnel, it identified no contractor sanctioned for discriminating against subcontractors and no County employee or official investigated or sanctioned for discrimination in procurement or contract

awards during that period. Ex. 3 at 5–6. Its Rule 30(b)(6) representative was likewise unaware of any contractor or subcontractor reporting that Harris County denied it a contracting opportunity because of race. Ex. 5 at 125:24–126:3. Nor does the Program attempt to match its racial classifications to a particular discriminatory injury. The annual 30% aspirational goal closely tracks the Study's 28.4% estimate of MWBE availability. Contract-specific goals likewise begin with the Study's availability figures; the City's 30(b)(6) witness testified that "[t]he last Disparity Study is the basis" for those calculations. Ex. 5 at 64:20–23. The system therefore measures how MWBE participation compares with estimated availability—not how much racial preference is necessary to cure any identified unlawful act.

*Croson* rejected the same disconnect. A race-conscious contracting percentage must be tied to the injury being remedied, otherwise the government cannot determine the "precise scope of the injury" or the remedy necessary to cure it. 488 U.S. at 498–500. And *W.H. Scott* invalidated the City of Jackson's contracting goal because the City lacked "particularized findings of discrimination" capable of supplying the necessary factual predicate. 199 F.3d at 219. Harris County has a disparity study. It does not have identified instances of constitutional or statutory discrimination that its race-conscious Program remedies. That is insufficient under *SFFA*, *Callais*, *Croson*, and *W.H. Scott*.

4. *The Study's statistical and anecdotal evidence does not establish the intentional discrimination necessary to support Harris County's asserted remedial interest*

Harris County's disparity study does not support its compelling interest. The Study's qualitative analysis measured purported disparities between the utilization and estimated availability of racial groups. It treated utilization at or below 80% of estimated availability as "substantively significant" and separately tested certain results for statistical significance. Ex. 1 at HCO-000037–000039; HCO-000068–000069. Those measurements describe differences in

outcomes; they do not identify why those differences occurred. Indeed, Harris County's own expert (and author of the Study's qualitative analysis section) testified that the disparity analysis does not determine *why* a firm failed to obtain County contracts, and that the quantitative analysis would not identify an individual County official or prime contractor engaging in a particular discriminatory act. Ex. 7 at 33:13–23, 100:10–18. A remedial racial classification must be grounded in identified intentional discrimination, not disparate outcomes. *Callais*, 146 S. Ct. at 1152–53 (quoting *Croson*, 488 U.S. at 499).

The anecdotal analysis is similarly inapplicable. This portion of the Study is based on stories gathered during business owner interviews and outreach. Ex. 6 at 74:13–21. Some interviewees were unable to attribute their contracting difficulties to alleged discrimination; for those that did, neither Holt nor Harris County investigated or attempted to corroborate the truth of those allegations. Ex. 6 at 74:21–75:11. Unsubstantiated stories are not the specific, identified unlawful discrimination that the Program must remedy to survive strict scrutiny.

**B. Harris County's MWBE Program is not narrowly tailored**

Even if Harris County could establish a compelling remedial interest, which it cannot, its Program independently fails strict scrutiny because its racial classifications are not narrowly tailored to any identified injury. Narrow tailoring demands an "exact connection between justification and classification." *Adarand*, 515 U.S. at 229 (citation omitted). The Fifth Circuit considers, among other things, "(1) the necessity for relief, (2) the efficacy of alternative remedies, (3) the flexibility and duration of relief, (4) the relationship of the numerical goals to the relevant market, and (5) the impact of the relief on the rights of third parties." *Walker v. City of Mesquite*, 169 F.3d 973, 982 (5th Cir. 1999).

1. *The Program is not an exact fit between the identified discrimination and the racial remedy*

Race-conscious relief must address the exact effects and harms of the identified discrimination. *Id.* Because Harris County's Program is calibrated to a racial group's representation in the marketplace and not identified instances of discrimination against that group, there can be no "exact connection between justification and classification" that narrow tailoring demands. *Adarand*, 515 U.S. at 229 (citation omitted). The Study on which the Program is based does not identify which parties committed discrimination or were discriminated against, which particular trades experienced discrimination, which particular contracts involved acts of discrimination, how much contracting opportunity was lost and by which racial groups, whether the purported discrimination continues, and whether any particular MWBE firm continues to suffer from discrimination. Ex. 7 at 100:10–18. Within the NAICS code for landscaping services, which includes Landscape Consultants, MWBE firms have near parity. *See* Ex. 19 at 17–18. Yet despite this lack of disparity, a mandatory MWBE goal still applies to Harris County landscaping contracts.

2. *Harris County did not establish that race-neutral measures were inadequate before imposing racial goals*

A race-conscious program should be the remedy of last resort. *Walker*, 169 F.3d at 982–83. And because race is a last-resort remedy, the Fifth Circuit has held that less sweeping alternatives—particularly race-neutral ones—must first be considered and tried. *Walker,* 169 F.3d at 983. *Croson* likewise found Richmond's program deficient where the government had not considered race-neutral measures and had available "a whole array of race-neutral devices" capable of expanding contracting opportunities. 488 U.S. at 507, 509. Harris County's Program fails those requirements in several independent respects.

The record does not show that Harris County first tried workable race-neutral measures, determined that they were inadequate to remedy identified discrimination, and only then resorted to racial classifications. That omission is particularly notable because Harris County and its consultant Holt recognized that race-neutral alternatives were available. Moreover, the Disparity Study itself described race-conscious decision making as a last resort and recommended neutral measures including unbundling, reducing unnecessary barriers, improving access to contracting information, and providing technical, bonding, and financing assistance. Ex. 1 at HCO-000045–000046. There is no evidence that Harris County implemented these race-neutral measures first and ultimately concluded they had failed. Instead, the County adopted racial goals while simultaneously developing or later implementing neutral alternatives. *See* Ex. 14 at HCO-000465.

That is the reverse of the sequence strict scrutiny requires. *Walker* invalidated race-conscious relief where promising neutral measures had not first been given a fair opportunity to work. 169 F.3d at 982–83. And *Croson* similarly rejected a contracting preference where the government had not first assessed available neutral mechanisms. 488 U.S. at 507.

*3. The Program is both overinclusive and underinclusive*

The Program also sweeps more broadly—and less precisely—than permissible for a remedial racial classification. *Croson* is particularly instructive. There, the Court faulted Richmond for extending preferences to racial groups without evidence that each had suffered relevant local discrimination and for providing racial preferences without asking whether the particular beneficiary had suffered from discrimination by the City or its contractors. 488 U.S. at 506–08. Administrative convenience could not justify treating race as the proxy for remedial entitlement. *Id.* at 508. Harris County's Program suffers the same structural failure. It presumptively includes broad racial categories—Black Americans, Hispanic Americans, Native Americans, and Asian Americans—yet Harris County admits that its definition of "minority" was

not based on specific data concerning the Harris County market. Ex. 4 at 3. The Program has no requirement that MWBE firms demonstrate they experienced discrimination from Harris County or a County contractor before receiving the Program's race-based benefits. Ex. 2 at HCO-000187–HCO-000189. Without "clear evidence tracing one-for-one" each of Harris County's preferred racial groups to "concrete discrimination in this context," these racial presumptions are not narrowly tailored. *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 491 (N.D. Tex. 2024).

Conversely, a non-MWBE firm receives no benefit even if it has experienced racial discrimination. The operative dividing line is the race or ethnicity of the firm's owners, rather than an individualized determination that the firm suffered the racial injury the County claims to remedy. This "scattershot approach" is insufficient for narrow tailoring. *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021).

Harris County's goal-setting system confirms this lack of narrow tailoring. The County's 30% annual goal closely follows the Study's 28.4% estimate of weighted MWBE availability, and contract-specific goals are generated from the Study's availability and utilization data. Yet Harris County does not even determine whether the MWBE firms counted as available actually have the ability, qualifications, or desire to bid on a particular contract at the relevant time. Ex. 5 at 95:17–21. In other words, the Program is a racial set-aside calibrated to representation—how many MWBEs are estimated to be available and how much County work they receive—not to the scope of any particular unlawful discriminatory injury. That is precisely the danger *Croson* identified: a remedial percentage must correspond to identified discrimination, not become racial balancing by another name. 488 U.S. at 507–08; *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (Racial balancing is "patently unconstitutional.").

*4. The Program may continue indefinitely*

Race-conscious measures must be temporary. *SFFA* reaffirmed that governmental racial classifications must "at some point—end" and cannot survive merely because the government periodically reviews whether it wishes to continue them. 600 U.S. at 213, 221–25. Harris County's original Policy nominally contained a five-year sunset, requiring the Program to expire unless reenacted and directing the County to conduct another disparity study before that date. That original period ended November 10, 2025. Yet in May 2026, Harris County's Rule 30(b)(6) representative testified that the Program "has not been sunset" and that she believed Commissioners Court had reenacted it. Ex. 5 at 127:11–128:1. Nor could the County identify a definite end point or measure under which the Program would become unnecessary—only the need for further study. Ex. 6 at 80:10–81:4. Race-based programs must end. *SFFA*, 600 U.S. at 225. Harris County's Program, with no set endpoint no defined measure of success, fails this clear requirement.

**C. Harris County's MWBE Program violates the "twin commands" of equal protection**

The Equal Protection Clause's "twin commands" require that race never be used as a negative and that it never operate as a stereotype. *SFFA*, 600 U.S. at 218. Harris County's program violates both commands simultaneously.

Under Harris County's self-performance policy, race determines whether a contractor keeps the entire value of a MWBE goal or must give the entire value away to a competitor. Ex. 2 at HCO-000197. Harris County's MWBE goals and self-performance policy are thus a benefit provided to some businesses but not others based on race, and "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter."

*SFFA*, 600 U.S. at 218–19. For non-minority contractors who must give away a percentage of a contract's value, their race unquestionably operates as a negative.

The Program also uses race as a stereotype. Harris County does not require minority-owned businesses to demonstrate that they have actually experienced racial discrimination before receiving preferential treatment under the MWBE Program. Ex. 2 at HCO-000187–HCO-000189. Instead, Harris County assumes that all Black, Hispanic, Native American, and Asian American business owners require government assistance—regardless of individual circumstances. This racial stereotyping is "contrary … to the 'core purpose' of the Equal Protection Clause," and invalidates Harris County's Program. *SFFA*, 600 U.S. at 221 (citing *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

**II. Harris County's MWBE Program Racially Discriminates in Violation of 42 U.S.C. § 1981**

42 U.S.C. § 1981(a) guarantees that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of the laws … as is enjoyed by white citizens." To establish a prima facie case under § 1981, a plaintiff must demonstrate that: (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288–89 (5th Cir. 2004). Regardless of the racial minority requirement, § 1981 "protects the equal right of all persons … without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). The statute's "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

The racial discrimination in Harris County's MWBE Program is intentional; the County purposefully enacted a race-conscious public contracting program and it enforces that program to

advantage some businesses over others based on the race or ethnicity of the business' owner. Because they are classified as a non-MWBE, Landscape Consultants must subcontract 100 percent of the value of a Harris County contract's MWBE goal, while their MWBE competitors may keep 100 percent of that value in-house. Ex. 2 at HCO-000197. A law or policy that expressly classifies people on the basis of a protected characteristic is direct evidence of discriminatory intent. *See, e.g.*, *Adarand*, 515 U.S. at 213, 227–29; *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

The MWBE Program also concerns the "making … of contracts," an activity enumerated under § 1981(b). Landscape Consultants has entered into between ten and twenty landscaping contracts with Harris County, but a contract "need not already exist" to trigger § 1981's protections; the statute "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza*, 546 U.S. at 475–76. Harris County's intentionally discriminatory MWBE Policy should be struck down.

## CONCLUSION

For the reasons stated, Plaintiff respectfully asks the Court to grant its motion for summary judgment, enter the declaratory and injunctive relief requested in the Complaint, and grant all other relief to which Plaintiff may be entitled.

DATED: September 11, 2026.

Respectfully submitted,

/s/ Erin E. Wilcox

Erin E. Wilcox
*Attorney-in-Charge*
Cal. Bar No. 337427
S.D. Tex. Bar No. 3369027
Pacific Legal Foundation
555 Capitol Mall
Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
EWilcox@pacificlegal.org

Laura M. D'Agostino*
*Of Counsel*
D.C. Bar No. 241868
Pacific Legal Foundation
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Fax: (916) 419-7747
LDAgostino@pacificlegal.org

**Pro Hac Vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing has been served upon counsel for all parties on September 11, 2026, via this Court's CM/ECF filing system.

/s/ Erin E. Wilcox
Erin E. Wilcox